ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| - v. — | 23 Cr. ___ |
| VICTOR BOZZO and EDWARD O'DONNELL, | |
| Defendants. | **23 CRIM 499** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy to Commit Securities Fraud, to Make False Filings with the SEC, and to Improperly Influence the Conduct of Audits)

The Grand Jury charges:

### Overview of the Scheme

1.      From at least in or about 2018 through in or about 2019, VICTOR BOZZO and

EDWARD O'DONNELL, the defendants, orchestrated a scheme to enrich themselves by

fraudulently inflating the reported revenue of Pareteum Corporation, a publicly traded

telecommunications company, known generally as "Pareteum," at which BOZZO and

O'DONNELL were employed as senior executives.  The defendants, and other senior executives

at the company, caused Pareteum to improperly and misleadingly recognize revenue, and thereby

make the revenue appear to have been earned in its records, based on aspirational, non-binding

purchase orders that did not impose any obligation on customers to pay Pareteum.  The

defendants, and other senior executives at Pareteum, knew that in many cases Pareteum was

recognizing revenue before Pareteum had delivered any products or services to its customers.

2.      The improper accounting practices instigated by the defendants and their co-conspirators caused Pareteum to overstate its revenue by tens of millions of dollars.  This inflated revenue gave the appearance that Pareteum was meeting aggressive revenue and growth projections, which served the ultimate goal of increasing Pareteum's share price.  In order to conceal Pareteum's fraudulent accounting practices, the defendants, and other senior executives at Pareteum, took steps to mislead the independent certified public accountants engaged to audit Pareteum's financial statements.

3.      After Pareteum's revenue recognition fraud was uncovered in the fall of 2019, Pareteum issued revised financial statements in which it reduced its previously reported revenue for fiscal year by approximately $12 million (60% of the ultimately restated revenue), and reduced its previously reported revenue for the first and second quarters of 2019 by approximately $30 million (over 90% of ultimately restated revenue).

**Relevant Individuals and Entities**

4.      At all times relevant to this Indictment, Pareteum was a publicly traded telecommunications company headquartered in New York, New York.  Pareteum's securities traded under the symbol "TEUM," first on the New York Stock Exchange and, after late 2018, on the Nasdaq exchange.  Pareteum was a telecommunications "Software as a Service" or "SaaS" company that offered various products such as SIM cards, WiFi service, and a cloud-based platform to its customers.  Pareteum's customers were telecommunications businesses that contracted with Pareteum for services and materials, and then sold those products to downstream users.

5.     From in or about 2016 through May 2019, VICTOR BOZZO, the defendant, was the Chief Executive Officer of Pareteum.  From in or about May 2019 through June 2020, BOZZO served as Pareteum's Chief Commercial Officer.

6.     At all times relevant to the Indictment, EDWARD O'DONNELL, the defendant, was Pareteum's Chief Financial Officer.  He has been a registered Certified Public Accountant since in or about 1996.

### Public Company Reporting Requirements

7.     At all times relevant to this Indictment, Pareteum was required to comply with the federal securities laws, which are designed to ensure that a publicly traded company's financial information is accurately recorded and disclosed to the investing public.  Specifically, pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, Pareteum was required to: (a) file with the United States Securities and Exchange Commission (the "SEC") annual financial statements (on SEC Form 10-K); (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); and (c) make and keep books, records, and accounts that accurately and fairly reflected Pareteum's business transactions.

8.     Federal securities law further required that Pareteum's annual financial statements be audited by independent certified public accountants.

9.     At all times relevant to this Indictment, EDWARD O'DONNELL, the defendant, signed Pareteum's quarterly and annual financial reports.  Additionally, Pareteum filed with each of its quarterly and annual financial reports certifications entitled "Certification of Periodic Report Under Section 302 of the Sarbanes-Oxley Act of 2002" in which O'DONNELL certified, in part:

1. I have reviewed this [quarterly or annual report] of Pareteum Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report; . . . .

In these certifications, O'DONNELL also certified that he had disclosed to Pareteum's independent auditor (the "Auditor"): "Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

10.     In conjunction with each of its quarterly and annual financial reports, Pareteum included a second set of certifications titled "Certification Pursuant to 18 U.S.C. Section 1350 As Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002," in which EDWARD O'DONNELL, the defendant, further certified, in part, that the quarterly or annual financial report

fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; . . . [T]he information contained in this [quarterly or annual] report fairly presents, in all material respects, the financial condition and results of operations of the Company.

11.     VICTOR BOZZO, the defendant, signed Pareteum's 2018 10-K report.  BOZZO also signed sub-certifications for Pareteum's Q1 and Q2 2019 financials, which included certifications that he had "no knowledge of any fraud or suspected fraud affecting the Company;" "no knowledge of any allegations of fraud or suspected fraud affecting the Company received in communications from employees, former employees, analysts, regulators, short sellers or others," and no awareness of "significant deficiencies, including material weaknesses, in the design or operation of internal control over financial reporting that are reasonably likely to

4

adversely affect the Company's ability to record, process, summarize and report financial information."

### Revenue Recognition Requirements

12.     Under Generally Accepted Accounting Principles ("GAAP") and SEC guidance, a company like Pareteum must take the following steps to assess whether and what revenue should be recognized: (1) identify the contract with a customer; (2) identify the performance obligations in the contract; (3) determine the transaction price; (4) allocate the transaction price to the corresponding performance obligation(s); and (5) recognize revenue when or as the entity satisfies a performance obligation by transferring control of a promised good or service to a customer.  This standard is set forth in FASB Accounting Standards Codification Topic 606, Revenue From Contracts With Customers, which is often referred to as "ASC 606."

13.     Pareteum disclosed in its 2018 Form 10-K that starting on January 1, 2018, Pareteum was reporting revenue in accordance with ASC 606 which, Pareteum correctly stated, "requires entities to recognize revenue when control of the promised goods or services is transferred to customers at an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services."

14.     VICTOR BOZZO and EDWARD O'DONNELL, the defendants, were familiar with and received training on ASC 606, including from the Auditor.  In or about March 2018, Pareteum, in conjunction with the Auditor, prepared a memorandum on ASC 606 (the "ASC 606 Memorandum").  The ASC 606 Memorandum reflected Pareteum's "analysis . . . as part of the adoption of Revenues from Contracts with Customers (ASC Topic 606)."  The ASC 606 Memorandum described in detail Pareteum's various business lines, relationships with customers and revenue recognition principles.  The memorandum described the ASC 606 criteria for

5

revenue recognition as including the requirements that "the collection of payment is reasonably

assured" and the "amount of revenue can be reasonably measured," as set forth below:

Although similar the five criteria for recognizing revenues per ASC 606 are:

1. Risks and rewards have been transferred from the seller to the buyer
2. The seller has no control over the goods sold
3. The collection of payment is reasonably assured
4. The amount of revenue can be reasonably measured
5. The costs of earning the revenue can be reasonably measured

The memorandum affirmed Pareteum's understanding that "if the prerequisites are not all met, you

cannot recognize the billings as revenue." Further, for Pareteum to recognize revenue on a

milestone or percentage of completion basis, the memorandum affirmed Pareteum's understanding

that contractual milestones "represent a satisfied performance obligation by the company for goods

or services provided."

## Pareteum's Disclosure and Promotion of Revenue Guidance and Results to the Investing Public

15. In press releases accompanying Pareteum's quarterly filings, Pareteum provided

guidance on its expected revenue and revenue growth for the year. During each period,

Pareteum touted its quarter over quarter revenue and revenue growth. For example, Pareteum

provided the following guidance for 2018 and 2019:

| August 6, 2018 Revenue Guidance | |
| --- | --- |
| Full Year 2018 Guidance | Full Year Growth Guidance |
| N/A | > 80% over 2017 |

| November 7, 2018 Revenue Guidance | |
| --- | --- |
| Full Year 2018 Guidance | Full Year Growth Guidance |
| N/A | > 100% over 2017 |

6

| March 12, 2019 Revenue Guidance | |
| --- | --- |
| **Full Year 2019 Guidance** | **Full Year Growth Guidance** |
| $105 – 115 million | 225% to 260% |

| May 7, 2019 Revenue Guidance | |
| --- | --- |
| **Full Year 2019 Guidance** | **Full Year Growth Guidance** |
| $115 – 125 million | 255% to 285% |

| August 6, 2019 Revenue Guidance | |
| --- | --- |
| **Full Year 2019 Guidance** | **Full Year Growth Guidance** |
| $120 – 130 million | 270% to 301% |

16.     Indeed, Pareteum publicly identified revenue as the principal metric demonstrating its growth and touted its consistent record of quarter-over-quarter revenue growth and meeting or exceeding revenue guidance, which itself typically increased quarter-over-quarter.  For example, on March 12, 2019, when announcing Pareteum's 2018 full year financials, Pareteum's Executive Chairman publicly stated, "2018 was a record year for Pareteum, achieving over 139% year-over-year revenue growth driven by the effectiveness of our cloud-based platform, innovative product solutions, employee talent and leading customers.  In fourth quarter of 2018, we reported 256% year-over-year revenue growth."

17.     Pareteum's Executive Chairman similarly touted Pareteum's revenue growth in announcing its Q1 2019 financial results, stating "We are very pleased with our strong first quarter results, delivering 460% revenue growth in Q1 2019 compared to Q1 2018. Pareteum's core business, pre-acquisitions, has grown 33% over the prior quarter."

7

## Pareteum's Customer Agreements

18.     In or about 2018 and 2019, Pareteum owned and managed a mobile device network platform. Its customers were cellular providers that paid to use Pareteum's platform to monitor, meter, and bill their own individual customers, who were individual cellphone or connected device end users.

19.     Typically, before a customer could use Pareteum's platform, the customer and Pareteum would sign a Master Services Agreement ("MSA"), which set forth Pareteum's obligations to provide the customer with SIM cards that provided cellphone users, who obtained cellphone service through Pareteum's customer, access to Pareteum's mobile network. At this stage, the customer did not owe Pareteum any money and no revenue had been earned by Pareteum; instead, Pareteum had first to develop and implement a platform for the customer, and ensure that it functioned such that the customer could go "live" on the Pareteum network. Once the Pareteum customer was live on the network and sold a SIM card to an actual cellphone user, that user could put the SIM card into his or her phone and begin making calls or consuming mobile data. It was only at that point that Pareteum's customer would be required to pay Pareteum for the data usage. The MSA typically did not include detailed information about SIM card orders. Instead, a client's order for a specific number of SIM cards was indicated on a separate document called a purchase order.

20.     VICTOR BOZZO and EDWARD O'DONNELL, the defendants, understood that purchase orders were not sales contracts, because as they and others at Pareteum well knew, and Paretuem's customers understood, the purchase orders did not reflect binding commitments. Instead, purchase orders typically reflected anticipated future sales. Purchase orders typically set forth the customer's intention to purchase SIM cards from Pareteum and to generate usage fees if

8

Case 1:23-cr-00499-AS   Document 1   Filed 09/27/23   Page 9 of 28


and when the customer was able to sell the SIMs to end users who then activated the SIM cards and used Pareteum's platform.

21.     Though the format of Pareteum's purchase orders changed over time, by late 2018 purchase orders typically included two different dollar amounts (1) the cost of SIM cards shipped to Pareteum's customer, and (2) the "expected value" of monthly billing resulting from the activation and usage of these SIM cards by end users, assuming each SIM in the purchase order was activated at the highest monthly rate for one month. This "expected value" amount, sometimes called "value upon activation," was typically a much larger sum than the cost of the SIM cards.

22.     Pareteum executives instructed other Pareteum employees to ship SIM cards to a customer at the time a purchase order was executed, though in practice that did not always occur. At the same time, Pareteum would typically send the customer an invoice that obligated the customer to pay only the value of the physical SIM cards actually shipped—a small amount, often approximately $1 per SIM card. The "value upon activation" portion of the purchase order was invoiced only "upon activation," that is, once the customer's end users began using the SIM cards. The "value upon activation" portion of the purchase order was typically invoiced only when Pareteum received breakdowns of actual usage from its SIM card providers that enabled it to charge its customers.

**Overview of the Accounting Fraud Scheme**

23.     Beginning in at least 2018, Pareteum engaged in an impermissible and misleading accounting practice of recognizing revenue for work that Pareteum had not yet performed and services it had not yet rendered, in violation of ASC 606.

24.     In particular, Pareteum executives, including VICTOR BOZZO and EDWARD
O'DONNELL, the defendants, caused Pareteum to recognize revenue at the time a purchase
order was signed for the full projected value of the purchase order, even though they were aware
that typically the relevant counterparties were obligated to pay that amount only if and when in
the future all SIM cards in the purchase order had been shipped, were activated by Pareteum's
customers, and were used for one month on Pareteum's network.  As BOZZO and O'DONNELL
were well aware, this practice violated ASC 606 for many of Pareteum's customers.  If Pareteum
had properly followed ASC 606, it would have recognized revenue only after Pareteum had
shipped the SIMs to the customer, the customer was active on the Pareteum network platform,
and the customer's end-users had activated and begun using their SIM cards.

25.     Further, as VICTOR BOZZO and EDWARD O'DONNELL, the defendants, were
also aware, in many cases, pervasive technical and operational issues meant that Pareteum was
actually incapable of satisfying its performance obligations under the terms of its agreements
with customers.  Due to staffing and supply issues, Pareteum did not consistently ship the
number of SIM cards set forth in the purchase orders.  And, beginning in 2018 and continuing
into 2019, technical and operational issues precluded many of Pareteum's customers from
gaining access to Pareteum's cloud network.  Thus, in many instances customers did not receive
the full number of SIM cards, and when they did receive SIM cards, they could not activate those
SIM cards and access Pareteum's network.

26.     VICTOR BOZZO and EDWARD O'DONNELL, the defendants, knew that, for
many customers, Pareteum could not properly recognize revenue in the full amount of the
customer's purchase order because Pareteum had not yet completed its performance obligations
– and indeed, could not complete them, due to technical and operational difficulties.  BOZZO

and O'DONNELL nevertheless persisted in causing Pareteum to recognize revenue in the full amount of those purchase orders and certified the accuracy of Pereteum financial statements that reflected the improperly recorded revenue.

27.     As a result of this fraudulent revenue recognition practice, from at least in or about 2018 through the first half of 2019, Pareteum improperly recognized and reported to the investing public more than $40 million of revenue that it should not have.  VICTOR BOZZO and EDWARD O'DONNELL, the defendants, and other senior executives caused Pareteum to engage in the illegal revenue recognition scheme in order to ensure that Pareteum's reported revenue figures fell within its publicly announced revenue guidance, and to deceive the investing public into believing, incorrectly, that Pareteum was accomplishing consistent growth quarter after quarter, as Pareteum had falsely touted.

### Pareteum's Fraudulent Recognition of Revenue from Customer-1

28.     For example, in or about March 2019, VICTOR BOZZO, the defendant, learned that Pareteum was $6 million short of its projected Q1 2019 revenues.  To assist in closing the gap, BOZZO and EDWARD O'DONNELL, the defendant, caused Pareteum to recognize $4.6 million in revenue based upon a purchase order signed earlier that month by a particular customer ("Customer-1") that, in transmitting the purchase order, made clear its understanding that that amount was "only paid 30 days after SIM is activated by the end-customer."

29.     On or about March 28, 2019, the penultimate business day of the quarter, EDWARD O'DONNELL, the defendant, emailed a subordinate in Pareteum's finance department that Pareteum was "shipping SIMs to fufill [sic] the entire [Customer-1] order. Let's invoice today, input into the rev rec sheet."  The full $4.6 million set forth in Customer-1's

purchase order was thereafter included as revenue in Pareteum's quarterly report on Form 10-Q for the first quarter of 2019.

30.     VICTOR BOZZO and EDWARD O'DONNELL, the defendants, were aware that at the time this revenue was recognized, Pareteum had not satisfied its performance obligations to Customer-1 and thus that revenue recognition was improper.  Indeed, as reflected in a series of email communications involving both BOZZO and O'DONNELL, by in or about May 2019, only approximately 73,000 of the 500,000 SIMs contemplated by the purchase order had been shipped to Customer-1, only 11 "test SIMs" were active, Customer-1 had not in fact been invoiced, and, due to a development backlog, Customer-1 was not even able to access Pareteum's network.

31.     VICTOR BOZZO and EDWARD O'DONNELL, the defendants, were also aware that Customer-1 had no obligation to pay Pareteum until these issues were resolved and Customer-1's end users were active on Pareteum's network.  Indeed, on or about June 3, 2019, more than two months after Pareteum had recorded as revenue the full $4.6 million set forth in Customer-1's purchase order, O'DONNELL told a subordinate that Customer-1 should be invoiced for the nearly $4 million outstanding under the purchase order only "[u]pon SIM activation," because Customer-1 would "freak out if they receive a large bill."  A few days later, BOZZO acknowledged to O'DONNELL that Customer-1 would only pay for Pareteum's services "when [Customer-1] starts letting his customers use the SIMs.  30-60 days is my gut."

**Pareteum's Fraudulent Recognition of Revenue from Customer-2**

32.     To take another example, in its quarterly report on Form 10-Q for the second quarter of 2019, Pareteum recognized approximately $2.88 million in revenue on the basis of a purchase order signed in or about May 2019 by a Nigerian telecommunications company

("Customer-2"). The $2.88 million figure in the purchase order assumed that Pareteum would ship Customer-2 50,000 SIM cards, all of which would be fully activated by Customer-2's customers.

33.     Yet, on or about July 3, 2019, three days after the close of the quarter, VICTOR BOZZO and EDWARD O'DONNELL, the defendants, were copied on emails making clear that Pareteum had not shipped any of the 50,000 SIM cards contemplated by Customer-2's purchase order and, indeed, that Pareteum did not have the ability to purchase the number of SIM cards it needed to ship to Customer-2 because of a billing dispute with Pareteum's SIM card supplier.

34.     As of in or about September 2019, Customer-2 had not paid Pareteum any amount.

### Pareteum's Fraudulent Recognition of Revenue from Customer-3

35.     Also in the second quarter of 2019, Pareteum recognized approximately $1.1 million in fraudulent revenue on the basis of a purchase order from a South American customer ("Customer-3"). Specifically, on or about June 25, 2019, Pareteum's Controller, Stanley Stefanski, emailed VICTOR BOZZO, the defendant, copying EDWARD O'DONNELL, the defendant, to tell them that Pareteum "may not be able to recognize the revenue from [Customer-3] as the sims are not going to ship prior to the end of the month and [Customer-3] currently doesn't have the ability to test sims on a Platform." As Stefanski explained, the failure to recognize revenue for the full amount of Customer-3's purchase order would cause Pareteum to miss its second quarter revenue guidance. In response, BOZZO directed that some (but not all) SIM cards be shipped to Customer-3 notwithstanding that Customer-3 did not have the ability to use them. BOZZO then directed that revenue be recognized for the full amount of Customer-3's purchase order even though Customer-3 had not received its full allocation of SIM cards, could

not use them because its platform was not operational, and consequently could not generate the end user usage contemplated in the purchase order.

**Pareteum's Fraudulent Recognition of Revenue from Customer-4**

36.     In or about January 2019, Pareteum was negotiating a purchase order with an Israeli company ("Customer-4") for IMSIs, or virtual SIM cards. Because IMSIs were virtual, SIM cards did not need to be shipped. Pareteum's sale representative drafted a purchase order for €6.3 million and circulated an unsigned version internally at Pareteum for approval, including to VICTOR BOZZO, the defendant. If it had been valid, the €6.3 million purchase order would have been Pareteum's largest-ever purchase order.

37.     On or about January 30, 2019, VICTOR BOZZO, the defendant, approved the terms of the draft €6.3 million purchase order. The next day, even though the €6.3 million purchase order had not been finalized or signed by the customer, Pareteum recognized revenue for 20 percent of the order, or approximately $1.4 million, at BOZZO's direction.

38.     On or about February 17, 2019, the Pareteum sales representative sent VICTOR BOZZO, the defendant, and others at Pareteum a signed purchase order with Customer-4 for only €630,000 – in other words, 1/10th of the draft €6.3 million purchase order.

39.     On or about February 27, 2019, despite having already recognized 20 percent of the draft €6.3 million purchase order, EDWARD O'DONNELL, the defendant, wrote VICTOR BOZZO, the defendant, copying others: "Let's determine the best way for us to show that we have met the performance obligation for the [Customer-4] IMSIs. This will receive revenue recognition scrutiny due to the material nature of the revenue recognized."

14

40.     VICTOR BOZZO, the defendant, ordered another 20% of Customer-4's €6.3 million purchase order—which was never finalized or signed and therefore never was an actual purchase order—to be recognized in or about February 2019.

41.     On or about March 11, 2019, VICTOR BOZZO, the defendant, pressured a Pareteum sales representative to start getting payment from Customer-4.  The sales representative told BOZZO: "[Customer-4] is not live yet, will check the contract terms now when they need to make a first payment."

42.     On or about May 3, 2019, Stefanski emailed VICTOR BOZZO and EDWARD O'DONNELL, the defendants, as well as Pareteum's chief sales representative, regarding April revenues.  Stefanski noted that Pareteum was "over $2 million short" of its revenue projections for the month and that he was waiting on a decision on how much of the remaining 60 percent of the €6.3 million purchase order with Customer-4 "[had] been earned."  BOZZO responded, "I would take one more 20 percent truanch [sic]," which Stefanski then booked, without any discussion of what milestones had been reached to justify this revenue recognition.

43.     On or about May 8, 2019, EDWARD O'DONNELL, the defendant, asked when Customer-4 would go live and start paying.  A Pareteum employee told O'DONNELL and VICTOR BOZZO, the defendant, that Customer-4 was almost ready to launch – in other words, it was not yet live and it could not yet use Pareteum's services.

44.     Pareteum's recognition of these three tranches of revenue from Customer-4 totaling $4.4 million violated ASC 606 in at least two independent ways.  First, Customer-4 actually signed a purchase order for only €630,000, or approximately $750,000 – not €6.3 million – and far less than the $4.4 million in revenue recognized.  Second, even if Customer-4 had signed a purchase order for €6.3 million, it violated ASC 606 to recognize revenue for a

customer without regard to whether Pareteum had satisfied its performance obligations to the customer.

**Pareteum Executives' Cover-Up Regarding Customer-4's Purchase Order**

45.    Email communications in or about July 2019 made clear to VICTOR BOZZO, the defendant, that the amount of Customer-4's signed purchase order was only €630,000.

46.    Rather than immediately correct Pareteum's improper recognition of over $4.4 million in revenue, VICTOR BOZZO and EDWARD O'DONNELL, the defendants, instead sought to convince Customer-4 to sign a purchase order for the full €6.3 million, and to backdate that purchase order to January 2019. However, Customer-4 refused, indicating that its board of directors was not willing to sign a backdated purchase order.

47.    On or about August 13, 2019, the SEC issued a subpoena to Pareteum requesting, among other things, documentation supporting the revenue recognized for Customer-4 in 2019.

48.    On or about September 8, 2019, the issue of Customer-4 was discussed at a Pareteum board meeting, as well as issues with purchase orders generally.

49.    In order to avoid discovery of their improper revenue recognition practices with respect to Customer-4 and with respect to Pareteum customers more generally, VICTOR BOZZO and EDWARD O'DONNELL, the defendants, continued to solicit Customer-4 to sign a backdated purchase order for €6.3 million.

50.    On or about September 15, 2019, Customer-4 expressed a willingness to have a related entity with the same management ("Customer-5") sign a purchase order not for the full €6.3 million, but for the $4.4 million that Pareteum had already recognized. Customer-4's representative agreed to do this if, in exchange, Pareteum paid Customer-5 $60,000, described as

a set up fee for its platform.  As Customer-4's representative explained to a Pareteum salesperson: "[a]s I said you need a document and I need small money."

51.     On or about September 22, 2019, VICTOR BOZZO, the defendant, asked EDWARD O'DONNELL, the defendant, if the contract with Customer-5 would help stave off scrutiny of Pareteum's revenue recognition practices with respect to Customer-5.  O'DONNELL responded: "Not as much as getting a signed PO/ the executed PO for €6.3 m will work best because I do not have to explain anything additional."  O'DONNELL continued, "We will work with the €4.4 million PO."

52.     Pareteum ultimately agreed to pay Customer-5 the $60,000 fee, and VICTOR BOZZO, the defendant, signed the invoice to authorize payment on or about September 23, 2019.  Following this payment, a digitally signed (but undated signature) version of the Customer-5 purchase order was signed for $4.4 mil with a "PO Date" of Jan. 31, 2019.

### Pareteum's Corruption of the Audit Confirmation Process

53.     Consistent with GAAP, when Pareteum recorded revenue on the basis of purchase orders, it made an offsetting entry on its balance sheet to reflect an increase in its accounts receivable.  But because due to the fraudulent scheme perpetrated by VICTOR BOZZO and EDWARD O'DONNELL, the defendants, Pareteum recognized revenue for amounts that customers did not yet owe, Pareteum's unpaid accounts receivable grew significantly in or about 2018 and the first half of 2019.

54.     In or about February 2019, the Auditor began its 2018 end-of-year audit testing and identified Pareteum's ballooning accounts receivable as a main risk area.

55.     To test the validity of the accounts receivable amounts, the Auditor sent letters to many of Pareteum's customers asking them to confirm that they agreed with Pareteum's record

of how much was owed to Pareteum as of year-end 2018, and that there were no side agreements with Pareteum regarding those amounts. If the amount was not in fact owed, the Auditor would consider whether Pareteum needed to revise or restate its revenue and accounts receivable figures for prior periods, whether Pareteum needed to write off any claimed amounts as bad debt expenses, and whether the Auditor could certify Pareteum's financial statements.

56.     Despite the fact that many of Pareteum's customers did not yet owe the amounts reflected on the audit confirmation letters, most of Pareteum's customers did eventually sign the audit confirmations, due in large part to the efforts by Pareteum executives to corrupt the audit. Specifically, VICTOR BOZZO and EDWARD O'DONNELL, the defendants, along with Stefanski and another employee, instructed salespeople to reach out to customers and encourage them to sign the audit confirmation letters by assuring those customers (contrary to the Auditor's understanding and intent) that the confirmation amounts listed were just forecasts or estimates, and did not represent amounts that the customers were actually committed to paying. With these assurances, and contrary to the language on the audit confirmation letters, most of the customers signed the audit confirmations and returned them to the Auditor, thereby providing false audit evidence.

57.     For example, in or about February 2019, the Auditor sent a customer ("Customer-6") an audit confirmation letter signed by EDWARD O'DONNELL, the defendant. The letter sought confirmation of $516,523.66 in accounts receivable, based on a March 2018 invoice for "12,000 Sims Bundle" and a December 31, 2018 invoice for "SIMs." The letter stated, among other things, "The above data as also described on the referenced invoice(s) . . . are in agreement with our records and there are no side agreements."

58.     In fact, Customer-6 did not owe Pareteum that amount, and its representatives
were reluctant to sign the audit confirmation letter.  In order to convince Customer-6 to sign the
letter, a Pareteum employee acting at the direction of EDWARD O'DONNELL, the defendant,
told Customer-6: "Note that this isn't a contractual commitment, rather a statement that you
intend to buy and use the services . . . there is no commitment."  Customer-6 then signed the
audit confirmation.

59.     Although EDWARD O'DONNELL, the defendant, knew that Pareteum was
improperly recognizing revenue, and had corrupted the audit confirmation process to hide this
from the Auditor, O'DONNELL signed the management representation letter sent to the Auditor
in or about March 2019, in connection with the 2018 year-end audit, which falsely stated that
Pareteum's 2018 financial statements were fairly presented in conformity with GAAP.

**The Pareteum Executives' Demotion of an Employee to Avoid Detection**

60.     In or about January 2019, Pareteum appointed a Chief Marketing Officer who had
previously held a senior operations role at another telecommunications company.   The Chief
Marketing Officer began learning about Pareteum's business and within weeks realized that
Pareteum's revenue recognition practices were problematic and that its customers were not
obligated to pay the amounts reflected in Pareteum's growing accounts receivable.

61.     On or about April 9, 2019, the Chief Marketing Officer sent an email to senior
Pareteum employees, including VICTOR BOZZO, the defendant, which noted that many of
Pareteum's customers were "paying on activations not shipments" of SIMs, and that Pareteum
needed "to revisit the 2019 revenue plans.  We have invoiced a lot of customers who are. . .
behind in their payments, also we billed and recognized revenue in advance of shipments and
delivery of service . . . [I]n 2018 we recognized revenues for customer[s] who are still not live as

19

of April 9, 2019. This is approx.. $8M in revenue." The Chief Marketing Officer concluded, "as I am not an expert in finance – I think it would be wise to take a look at the situation from a financial perspective."

62.     Approximately a day or two after sending this email, VICTOR BOZZO, the defendant, and another Pareteum executive informed the Chief Marketing Officer that she was being demoted. The Chief Marketing Officer resigned shortly thereafter.

63.     When other Pareteum employees tried to raise concerns about Pareteum's revenue recognition practices with VICTOR BOZZO and EDWARD O'DONNELL, the defendants, BOZZO and O'DONNELL became upset, were dismissive, or ignored the employees. BOZZO and O'DONNELL did nothing to change Pareteum's practices, even as the revenue that Pareteum fraudulently recognized and the corresponding accounts receivable grew through the end of the second quarter of 2019.

### Pareteum's Restatement of Revenue

64.     The SEC served Pareteum with a subpoena on or about August 13, 2019, seeking, among other things, support for Pareteum's recognition of revenue for certain of its customers with large accounts receivable, including Customer-1, Customer-2 and Customer-4.

65.     After beginning a review of its revenue recognition practices, on or about October 21, 2019, Pareteum publicly announced that its financial results for all of 2018 and the first two quarters of 2019 required restatement. Pareteum estimated that the restatement would reduce 2018 revenue by $9 million and the first half of 2019 by $24 million. Following this announcement, Pareteum's stock price fell from $0.74 per share on or about October 21, 2019, to close at $0.30 on or about October 22, 2019 – a one day drop of 59.5%, eliminating approximately $49.2 million in market capitalization.

20

66.     On or about December 14, 2020, Pareteum restated its financial results for 2018,

reducing the full year revenue from $32.4 million to $20.3 million.  On or about March 12, 2021,

Pareteum reported its financial results for 2019, reporting a full year revenue of $62.05 million,

including restated quarterly financial results for the first half of 2019 – reducing its stated

revenue for the first quarter of 2019 from $23.04 million to $13.07 million, and for the second

quarter of 2019 from $34.2 to $16.9 million.

67.     According to the figures in Pareteum's restatement, therefore, Pareteum's prior

public filings had materially overstated revenue by approximately $12 million for fiscal year

2018 (60% of the ultimately restated revenue), and by approximately $30 million for the first and

second quarters of 2019 (91% of the ultimately restated revenue).

### Performance-Based Bonuses

68.     VICTOR BOZZO and EDWARD O'DONNELL, the defendants, personally

obtained bonuses tied to Pareteum reaching revenue targets, which were met only due to

Pareteum's fraudulent revenue recognition practices.

69.     In or about 2019, VICTOR BOZZO, the defendant, received a performance bonus

of approximately $225,000 based on Pareteum's performance for 2018, including recognized

revenue.  BOZZO received approximately 300,000 shares of Pareteum stock valued at

approximately $700,000 and stock options valued at approximately $460,000.

70.     In or about 2019, EDWARD O'DONNELL, the defendant, received a

performance bonus of approximately $60,000 based on Pareteum's performance for 2018,

including recognized revenue.  O'DONNELL received stock options valued at approximately

$150,000 with a strike price of $1.

21

**Statutory Allegations**

71.     From at least in or about 2018 through at least in or about 2019, in the Southern

District of New York and elsewhere, VICTOR BOZZO and EDWARD O'DONNELL, the

defendants, and others known and unknown, willfully and knowingly did combine, conspire,

confederate and agree together and with each other to commit offenses against the United States,

to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and

Title 17, Code of Federal Regulations, Section 240.10b-5; making a false and misleading

statement of a material fact in an application, report, and document required to be filed with the

SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated

thereunder, in violation of Title 15, United States Code, Sections 78m(a) and 78ff, and Title 17,

Code of Federal Regulations, Sections 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13; and

improperly influencing the conduct of audits, in violation of Title 15, United States Code,

Sections 7202, 7242, and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2.

72.     It was a part and an object of the conspiracy that VICTOR BOZZO and

EDWARD O'DONNELL, the defendants, and others known and unknown, willfully and

knowingly, directly and indirectly, by use of a means and an instrumentality of interstate

commerce and of the mails, and of a facility of a national securities exchange, would and did use

and employ, in connection with the purchase and sale of a security, a manipulative and deceptive

device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5

by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a

material fact and omitting to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading; and

(c) engaging in an act, practice, and course of business which operated and would operate as a

22

fraud and deceit upon a person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

73.     It was a further part and an object of the conspiracy that VICTOR BOZZO and EDWARD O'DONNELL, the defendants, and others known and unknown, willfully and knowingly would and did make, and cause to be made, a statement in an application, report, and document required to be filed with the SEC under the Securities Exchange Act of 1934 and a rule and regulation promulgated thereunder, which statement was false and misleading with respect to a material fact, in violation of Title 15, United States Code, Sections 78m(a) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13.

74.     It was a further part and an object of the conspiracy that VICTOR BOZZO and EDWARD O'DONNELL, the defendants, and others known and unknown, willfully and knowingly would and did take actions to fraudulently influence, coerce, manipulate, and mislead an independent public and certified accountant engaged in the performance of an audit of the financial statements of an issuer for the purpose of rendering such financial statements materially misleading, by, as officers of a company issuing publicly traded securities, directly and indirectly, (a) making and causing to be made, a materially false and misleading statement to an accountant, and (b) omitting to state, and causing another person to omit to state, a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant; with these false statements and omissions being in connection with an audit, review, and examination of required financial statements of the company and the preparation and filing of documents and reports required to be

filed with the SEC, in violation of Title 15, United States Code, Sections 7202, 7242, and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2.

Overt Acts

75.     In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a.     In or about early 2019, VICTOR BOZZO and EDWARD O'DONNELL, the defendants, directed Pareteum's salespeople to tell Pareteum's customers that audit confirmation forms requested by the Auditor were just forecasts or estimates and did not represent amounts that the customers were committed to paying, even though the defendants knew and understood that the Auditor sought to confirm that Pareteum had satisfied its performance obligations under the customer contracts.

b.     On or about March 28, 2019, EDWARD O'DONNELL, the defendant, directed Pareteum employees to recognize the full projected amount of Customer-1's master purchase order, despite the facts that, among other things, O'DONNELL knew that Customer-1 had not yet received SIM cards, its platform for using the SIM cards was not yet ready due to Pareteum's developmental delays, and Customer-1 did not have an obligation to pay Pareteum.

c.     On or about May 3, 2019, VICTOR BOZZO, the defendant, directed Stefanski to recognize a third 20-percent tranche from Customer-4's unsigned €6.3 million purchase order, despite knowing that there was no valid accounting basis to recognize this arbitrary amount of revenue.

       d.      On or about August 9, 2019, EDWARD O'DONNELL, the defendant, certified the financial statements and other financial information in Pareteum's quarterly financial report on SEC Form 10-Q.

       e.      On or about September 23, 2019, VICTOR BOZZO, the defendant, signed an invoice authorizing payment to Customer-5, in exchange for Customer-5 signing a backdated purchase order for the same amount of revenue that Pareteum had previously improperly recognized for a different customer.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
**(Securities Fraud)**

The Grand Jury further charges:

76.     The allegations contained in paragraphs 1 through 70 and paragraph 75 of this Indictment are repeated and realleged as if fully set forth herein.

77.     From at least in or about 2018 through at least in or about 2019, in the Southern District of New York and elsewhere, VICTOR BOZZO and EDWARD O'DONNELL, the defendants, willfully and knowingly, directly and indirectly, by use of a means and an instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which

25

operated and would operate as a fraud and deceit upon a person, to wit, O'DONNELL and

BOZZO engaged in a scheme to fraudulently inflate Pareteum's publicly reported revenue.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations,
Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE
### (False SEC Filings)

The Grand Jury further charges:

78.     The allegations contained in paragraphs 1 through 70 and paragraph 75 of this

Indictment are repeated and realleged as if fully set forth herein.

79.     From at least in or about 2018 through at least in or about 2019, in the Southern

District of New York and elsewhere, VICTOR BOZZO and EDWARD O'DONNELL, the

defendants, willfully and knowingly made and caused to be made a statement in an application,

report, and document required to be filed with the SEC under the Securities Exchange Act of

1934 and the rules and regulations promulgated thereunder, which statement was false and

misleading with respect to a material fact, to wit, O'DONNELL and BOZZO caused to be filed

with the SEC quarterly filings on Form 10-Q, press releases on Form 8-K, and an annual report

on Form 10-K, regarding Pareteum's financial results for the year-end 2018, and first and second

quarters of 2019, which omitted material facts and contained materially misleading statements.

(Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations,
Sections 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13; and Title 18, United States Code,
Section 2.)

## COUNT FOUR
### (Improperly Influencing the Conduct of Audits)

The Grand Jury further charges:

80.    The allegations contained in paragraphs 1 through 70 and paragraph 75 of this Indictment are repeated and realleged as if fully set forth herein.

81.    From at least in or about 2018 through at least in or about 2019, in the Southern District of New York and elsewhere, VICTOR BOZZO and EDWARD O'DONNELL, the defendants, willfully and knowingly took actions to fraudulently influence, coerce, manipulate, and mislead independent public and certified accountants engaged in the performance of audits of the financial statements of an issuer for the purpose of rendering such financial statements materially misleading, and did so, as officers of a company issuing publicly traded securities, by (a) making, and causing to be made, a materially false and misleading statement to an accountant, and (b) omitting to state, and causing another person to omit to state, a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant; with this false statement and omission being in connection with audits, reviews and examinations of required financial statements of the company and the preparation and filing of documents and reports required to be filed with the SEC, to wit, O'DONNELL and BOZZO made, and caused another to make, affirmative misrepresentations to the Auditor, and intentionally withheld information from them, regarding Pareteum's revenue recognition practices and growing accounts receivable.

(Title 15, United States Code, Sections 7202, 7242, and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Section 2.)

## **FORFEITURE ALLEGATIONS**

82.     As a result of committing one or more of the offenses charged in Counts One

through Four of this Indictment, VICTOR BOZZO and EDWARD O'DONNELL, the

defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section

981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that

constitutes or is derived from proceeds traceable to the commission of said offenses, including

but not limited to a sum of money in United States currency representing the amount of proceeds

traceable to the commission of said offenses that the defendants personally obtained.

### Substitute Assets Provision

83.     If any of the above-described forfeitable property, as a result of any act or

omission by the defendants:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided without

difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and

Title 28, United States Code Section 2461, to seek forfeiture of any other property of the

defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981(a)(1)(C);
Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461.)

GRAND JURY FOREPERSON

DAMIAN WILLIAMS
United States Attorney

28